Case number 14-5331, Gerald Deom et al v. Walgreen Company. Argument not to exceed 15 minutes per side. Mr. Hirshberg, you may proceed for the appellants. Thank you. Good morning, Your Honors. Good morning. Please, the Court. Mr. Stover. My name is Paul Hirshberg. I have the privilege of representing Jerry Deom and his company, Deom Health Enterprises. Mr. Deom is present today in court. The issue on this appeal is whether the covenant of good faith and fair dealing under Illinois law applied to the asset purchase agreement by which Jerry sold his pharmacies to Walgreens, and if so, what that covenant compelled Walgreens to do, or conversely, would it prohibit it. We submit that the implied covenant of good faith and fair dealing compelled Walgreens to act reasonably after the closing of the transaction, after it took over the assets, to bring about the conditioned precedent that would have triggered an earn-out payment to Jerry of an additional $800,000, or a lesser sum depending on the number of prescriptions kept. You know, I mean, regarding the number of prescriptions, I was kind of a bit surprised at the numbers that were required here. I mean, and correct me if I'm wrong, actually at all, but my understanding is that your client's stores, before the sale, built about 308 prescriptions per week. I think the total slightly in excess of 400, Your Honor. Oh, really? Yeah. In the asset purchase agreement, it indicates that at the time of that agreement, it separates by store. It doesn't say this is how many we have. One store had approximately 100, another about 200, another 90. There were three stores. The total sum, as I recall, is about 405. Okay. So if you're correct, I appreciate that correction. In any event, though, in order for the full payout to be demoted, I guess Walgreens had to sell 260 prescriptions a week. So we're talking about a pretty high retention rate that's required for at least the $800,000. That's correct, Your Honor. And I believe it's rough numbers. 90% triggers the maximum, 75% triggers the minimum. 308 is the floor. 405 is the base. And, excuse me, I'm trying to find the 405 in the provision. That's okay. We can chase that down. I don't want to take any time on that. Prior to the closing, when they're negotiating, Walgreens goes in. Walgreens dispatches a third-party company to come in, look at all the prescriptions. So they are abundantly aware of how many prescriptions are being filled. And then there's a passage of time between the APA and the closing. And Jerry is obligated because he has discretion. He's still running the stores. He has a variety of obligations in this time. Maintain everything in the ordinary course of business. Don't disclose that on this day your stores are going to be closed and we're going to come in and take over. He fulfills all of those. And after the closing, after he hands over the— I don't think it really hurts because my client, before the closing, what Matt, which is sort of the key moment, those obligations have to be spelled out because otherwise he's going to hand Walgreens the keys to something that is not what it's supposed to be. Okay? So he's got 405 prescriptions. If he lays off three or four people in the three months, he could essentially tank the value of the asset. Walgreens, who's the drafter of the agreement, wants to make sure that doesn't happen. So it specifically puts those obligations on him. After the closing, after he's out of the picture, his obligation is also fairly spelled out. But that obligation is exit stage right. That's what it is. The contract also imposes specific obligations on Walgreens that relate to this kind of best efforts. It says, Walgreens failed to join Express Scripts' pharmacy provider network within the nine months. They're an operating and sales target to be reduced by an elaborate government. It seems—I mean, answer that. I shouldn't let you go ahead and answer that yet. The only provision in Express Scripts is a specific sort of set-aside, and it was contemplated between the parties. There's going to be a problem with Express Scripts. They're going to go by the wayside. We can't have whether a NIRNAP target is met or not be determined by what happens with Express Scripts. Parties contemplate that. They deal with it. And those are the provisions to which you're— Isn't it pretty typical to contemplate a best efforts clause? I mean, the upshot of this case, if your theory prevails, in my view, is not in fight with the company they're dealing with. What's really going on is it's become a best efforts clause. It's a reasonable efforts. It's not a best efforts. A best efforts provision, which is a higher standard, is not implied. We could have insisted upon in the nine months Walgreens will exercise its best efforts to retain all of these prescriptions. Walgreens may have agreed to that. They may not have agreed to that. That's not one of the terms of the contract, and I can't pick and choose and say anything that I think would have been a best practice. If you didn't do that, it's a breach of the covenant of good faith and fair dealing. But that takes me to my question, if I may. And that is that we're here, of course, on a motion to dismiss. Yes. Appeal from the granting of that motion. And the question – well, one of the questions in my mind is the extent to which the pleadings did or didn't sufficiently allege that. And I'd like to address that question, particularly in light of the cases that seem to say that if you have aligned interest here. Now, Walgreens has an interest in retaining customers and attracting new customers as if customers. Your client has an interest in having these customers retained in order to get his payout. So when you have aligned interest, where is the – how does that affect the analysis of whether the pleadings sufficiently allege whatever it is they have to allege? Let me break that into two questions because I think it's two questions. Right. First of all, with regard to the sufficiency of the pleadings, the pleadings are – which is really the complaint in this case – sufficiently detailed between paragraphs 17 and 22, all of the failures of Walgreens to behave reasonably once it took over. So what I think is sort of subsumed within Your Honor's question is while those paragraphs refer to failure to provide reasonable levels of service and essentially dropping the ball, they don't suggest anything nefarious. And they don't suggest that Walgreens, while its interests are superficially at least aligned with Jerry's for the reasons Your Honor stated, it would appear perhaps from the moment of closing afterwards that those interests are not aligned. And perhaps Walgreens was more interested in acquiring the inventory, getting Jerry out of the picture, and going forward in a different direction, which was not something known or anticipated by Jerry. Well, I mean that seems inconsistent with the argument that your client – or that it's the fact that your client had these obligations to maintain the value of the asset, as you put it, and the asset being the customer base. But he had to preserve everything. He had to preserve his status quo from the time that he was negotiating till his close. But he could have tanked the customer base and still achieved the goals you just mentioned, i.e. get out of the way and get over the inventory and get over the, I guess, the buildings themselves. There were expressed provisions that would have permitted Walgreens not to close the deal if he had tanked between the time of the agreement and the close. I mean my point is that there does seem to be every reason to think that Walgreens had every incentive to want to grow this customer base, maintain it as best they could. And, Your Honor, in Judge Rosenthal's question, I think presumes that that fact and that superficial alignment of interest works against me. I think it works for me because that is what enterpases, what brings in this covenant of good faith and fair dealings. Jerry could reasonably assume and was entitled to assume that the entity that took over his business would then be a steward of that business. And that was not separately set forth in the contract, but it certainly was consistent with what he believed and what he was entitled to believe. But your client seems to take the position, hey, I don't know if they were being sloppy, if they were making poor business judgments, or if they were out to prevent me from getting my payout. And were operating in bad faith toward that end, intending as soon as they didn't owe me anything to turn around and start running huge sales and trying to get back the customers they had lost. When your client itself says, I don't know, is that a plausible allegation of bad faith if that is required? Absolutely. And that is comment D to section 205 of the restatement. That is the case of Diane or Diane versus McDonald's Corp. 466 Northeast 2nd, 971, 972 of the pinpoints of the Illinois Court of Appeals. And is that your best case? I think that's my best case. I think Barajas is a really good case too. While you're talking about cases, see if you can put them in this framework. What seems difficult to me from the law side of this case is, on the one hand, I think it's pretty black-letter law that negligence in filling in a contract does not state a breach of contract. That's a basic black-letter principle. I think it's a basic black-letter principle that normally is applied in public to a case of fair dealing. But you do have some cases, and you do have suggestions in the restatement, that there are settings, and the whole point of these cases is very contextual, where sometimes reasonableness is what's implied. The only thing that makes sense to me out of this, because otherwise everything collapses, is that the good faith in fair dealing, in a reasonableness sense, really only implies when it's a conditioned precedent for the whole donor contract. A really good example is, you sign a contract to buy or sell a house, and the buyer, it's conditioned by the buyer making the financing. I think there it's probably going to be true, but you don't have to show bad faith to get financing. You have a problem if you didn't take reasonable steps to get financing. The reason that makes sense is, shoot, that's the whole condition for the whole deal. Well, that's not really true here, because obviously at the time of contract signing, a lot of performance happened right away. So it really gives me pause that you're now starting to say negligence, which is, I think, all you're being alleged to say, which I think is you're being honest. All you think it does is you're alleged. But that worries me, that it's going to apply to a lot of settings, including this one, where I'm not sure it's supposed to. I think it is supposed to. And my best case, because of your question, just went from being Diane to being Baraha with it, which is the needle case. So just tell us what happened in the needle case. Baxter Pharmaceuticals gets his product. They have a license. They can go forward. They're going to market it. They're going to do whatever is best. They're going to pay in royalties. Court says you could – All of the payment in that case of royalties? Not all of the payment. But it doesn't have to be all that payment. I'm asking about that case. Is most of the payment in that case of royalties? No. How does it break down? The court reverses a grand summary judgment on the good faith and fair dealing. It says the question is whether they acted reasonably. Now, they could, in the Baraha court specifically, they could have decided in the exercise of reasonable business judgment not to market the product at all. And they might win on that basis. But they had to act reasonably. Now, I understand – and I think – I apologize that I'm running out of time. But I think Your Honor's trepidation is coming at some point from I don't want to take what is fundamentally an arm's length deal and somehow elevate them not to a fiduciary status but to the status where they have to be acting for your benefit. Do you agree that negligence in implementing a contract is normally not stated in each contract? If that is the normal rule? Absolutely. Absolutely. But with respect to a condition precedent, it is within the control of one party. And post-closing, the attainment of this condition precedent rests solely in Walgreens' control because my guy's on the sidelines. I'm willing to implement the good faith and fair dealing. I just don't think it should be reasonable. I think it should require one thing. That's all I'm saying. I'm with you on implying something. When they are in control, my client is not. The condition precedent operates in favor of my client. The standard is one of reasonableness. And a pure negligence, dropping the ball, slacking off per comment D to Section 205, per the Diane case, gives me a viable client. Now, what did my subsequent discovery – Let me ask you a question. Doesn't Diane then, in turn, define reasonable efforts to be positive efforts? And that term is – Well, yes. And then the question becomes, what are the positive efforts in Walgreens? Yeah. And so now it's not really sounding so much like negligence. It's, you know, did they do something? Did they make a positive effort as opposed to sit around and do nothing? And here they – I mean, I like how they did it, and I totally understand where you're coming from. But they were trying. I don't know. Maybe they're just – I don't think that they were trying. They were trying is certainly not part of the record. What's part of the record is the store that they had prior to taking my client's assets remained open. That doesn't, to me, mean they were trying. They, who are a very sophisticated company, took three of my clients to ongoing businesses. I think you're getting full rebuttals. I apologize. Keep going. I'll stop. All right, great. Thank you. Thank you for answering my question. Thank you. Mr. Silver? I'm going to go check on what it's all about. I'm going to go see if there's a guard out there. You can go ahead. I'll start your timer. Thank you. May it please the Court, Mr. Hershberg. The issues before this Court, I think, are framed and answered in four opinions and orders entered by Judge Haber, where he carefully considered Illinois law and the allegations in the complaint. And it is our position that under the so-called Iqbal Twombly opinions that there are not facts alleged in this complaint that constitute a cause of action. There are numerous mentions of opinions. And so what about the point that, I mean, he does have some Illinois cases? And it's a part of my question. It does seem to lead, in some cases, when it applies to government-approved rape and fair dealing, the standard they're talking about has this reasonable misnegligence component to it. And I think it's fair to say that the complaint alleges negligence by your client. So what's the answer to those cases? How do you deal with that? Your Honor, I thought that one of the questions and comments that you made answered the question, and I'll come back to that. But it is my view, and I think it was Judge Haber's view, I know it was Judge Haber's view from reading his opinions, that the covenant of good faith under Illinois law is implied if it is not expressed in the contract. It is implied in those instances in which one party peculiarly has control of the event. In this case, the complaint fails to state that. But what about control over how many people to put on the staff? How many people to have on the phones? How many people to have available to fill prescriptions? Your Honor— How is that controlled? Mr. Deaton did not. We had control of our own actions, and there is no complaint here that the store hours were shortened, the days that the store was open were eliminated, or that the staff was cut in half. There is no allegation in the complaint that any of the methods of operation of Walgreens were changed. That would have been within its control. Well, I mean, this is a tough argument for you to make on 12-6. I mean, you're basically saying they didn't plead that your client was negligent. I think Mr. Herzberg's answer would be, well, guess what? You needed to add a lot of staff. That's why you bought all these stores and had all this new customer base coming at you to get ready. You didn't. I mean, is this the ground you're going to kind of stand on? Your Honor, the Illinois law and Judge Haber's opinion, again, talk about contractual discretion imposing the duty of good faith and fair dealing. In this case, sales of prescriptions are not controlled by Walgreens any more than Apple can. They have a lot of influence on them, right? We are a component, but we do not peculiarly control sales. They are controlled by the market. But you do control staffing. You do control how long it takes you to respond to customer inquiries or to prescription requests. We do control the operation of the store, and there's no factual allocation in the complaint that that was done improperly or in bad faith more particularly. Let's assume that we do find that this is sufficiently within Walgreens' area of control, discretion, to impose the duty. Are the pleadings sufficient to allege a violation of that duty? Your Honor, the pleadings simply talk in terms in paragraphs 17 to 24 of things like unhelpful staff, unpreparedness, not appropriate steps. Those are the opinions of Mr. DeYoung, the seller. They are not facts. They are conclusions and opinions and beliefs of Mr. DeYoung in this case. I mean, you know, it would be one thing if they said Walgreens operated its business in a manner that prevented or precluded retaining customers, period. But, I mean, he's actually trying to give you an explanation more specifically about the reasons why Walgreens fell short in meeting its retention rules. And that's all the pleadings require. Well, the pleadings is not broad cases. Well, to quote from Iqbal, a pleading that offers labels and conclusions or a formulated recitation of the elements of a cause of action will not do. But to take that to Kevin's point, if the complaint had alleged Walgreens operated in bad faith after the APA closed and therefore breached its duty of good faith, that would be an example of an inefficient pleading because its conclusion simply stays the same. That's different from saying, here are the specific facts of how they failed to operate that caused there to be a problem with retaining customers. But in this case, Your Honor, those kinds of things are not alleged with all due respect. Secondly, the sales of prescriptions are not peculiarly within the control of Walgreens. That's a given. It depends on the market. But you're going back to your first point. Correct. So I think what we're on is a somewhat different point, which is, if the duty does apply, does your complaint, does Mr. Neal's complaint, excuse me, sufficiently allege its violations? Well, obviously, it is our belief that it does not. To use the Baraha case as an example, in Baraha, Baxter paid $50,000. The majority of the compensation was to be in the form of royalties. And it was alleged in that case that Baxter did nothing to produce and market the biopsy needle that was at issue in that case. In this case, it's undisputed and conceded that out of the 84,000 prescription fills that were in the contract to earn a bonus or a payout, 57,000 were fulfilled. But we're on motion to dismiss review, not on what evidence might have been appropriately considered in the later summary judgment portion. Well, Your Honor, with the allegations and the evidence properly considered under a 12B6 motion… In this case, Your Honor, there was a summary judgment on the issue of breach of contract. I understand. In which there was discovery and a massive production of these prescriptions. And that is part of this record. What? On the 12B6, dealing with the breach of the duty of good faith and fair dealing? Well, I don't see how… Here's my suggestion. Here's my way of thinking about it. You're going to lose if reasonableness is the test for what your client was supposed to do. You win if reasonableness was not the test. And that's a legal question that doesn't have to do with what they did in that complaint. You either can show that the cases in which reasonableness don't apply or they're going to go on 12B6. I don't know how else to think about the case. Well, I agree with the court. I was… I thought I was responsible. You don't have to make any questions, but I'm just… I'm now… You've got another question. Okay. I agree with you. And I think it is a legal analysis under Illinois law. So you've talked about Baraha. I take your point there as they are that condition precedent. It's essentially the whole deal. Right. Whether the money was paid by that to Baxter's 50,000 or from Baxter's 50,000. What are the other cases that use the word reasonableness? I'm sorry, but the T.R. McClure case that they rely upon so much, in that case, Judge, the buyer increased the prices. The buyer refused orders. Now, those are clearly within the discretion… Part of it was the work was done in a shoddy manner. That was only part of it. Okay, but… That was alleged. I seem to think that's important. Why isn't that similar to what is alleged here with respect to the shoddy customer service? Again, Your Honor, in that case, there were objective steps alleged, specifically raising prices and refusing orders. I mean, the pleading stuff… I mean, we've had that conversation. Okay. I mean, I think Judge Sutton's question goes to the existence of the duty. In this case, they seem to think that a shoddy manner of handling customers was a breach of a duty so that you have a duty to not treat your customers well or something. What's your response? Well, I think it goes back to, again, the McDonald's case, which has been discussed. But let's talk about this case. I mean, doesn't this case stand for the proposition that in these burnout… With respect to a burnout provision, that the party that is interacting with the customer has an obligation under this good faith and implied duty to do a better than shoddy job? In that case, though, Your Honor, the distinction that I would make is that there were additional things alleged that were peculiarly within the control of the buyer, specifically declining orders and raising prices. In our case, we don't have that. It would be pure speculation on my part to try to speak for that court and say without raising prices and without declining orders that they would have implied the duty. I don't know. But that case is factually different from our case. There are no items peculiarly within our control where we did not act in good faith. In this case, as in every other case, sales are a component of the market. It could have been, as the court points out, Judge Haber pointed out in this case, it could have been competition. It could have been lack of loyalty of – or extreme loyalty of the buyer to the customer. Well, Your Honor, I think it's a threshold question with regard to the implied duty of good faith and fair dealing under Illinois law. That duty only arises when there are no express terms about best efforts, and there are none here. So the implied duty under Illinois law only arises with regard to those events over which one party has peculiar control. Isn't the staffing one such event? And you shouldn't advocate this sort of distance from – I'm sorry, this is a little distracting. Your Honor, in this case, the only allegation is inadequate staffing. I mean, that's a pretty material allegation. In Mr. DeYoung's opinion, there is no allegation that we – Isn't that an event in your control? And if so, why would that trigger duty? Staffing is an event that is within the control of Walgreens. No question about that. However, what is inadequate? That's a conclusion. That's an opinion. It is not a fact, such as you laid off half of the staff. But just to get away from that question, back to another question, reasonableness versus bad faith. In looking at the complaint and whatever other material is properly considered, feel free to speak to that issue as well, which side of that line applies to you under Illinois law? Under Illinois law, good faith, the implied duty of good faith and fair dealing applies to the express terms of the contract. There is no requirement here about best efforts on the part of Walgreens. Does that mean that in order to show a violation of an implied duty, if one is present, that there must be allegations of facts that, if proven, would give rise to an inference of that improper motive? Correct. That is not reasonableness? Correct, as well as allegations that those acts, those bad acts, are peculiarly... I understand that part of your argument. But again, under Illinois law, if bad faith applies, as Doug Sutton says, your client is in better shape. So your best case for bad faith being a required element to you is what? That it must be within the control of my client. That's true. Now, again, putting that part aside, assuming it, however you want to put it, it's a different bush. I think, Your Honor, if you're speaking of a reported case from Illinois, I think... Pardon me? Best case, yes. Okay. I think the cases that we cited in our brief, and the one that I rely upon, is the Mayan v. McDonald's case. I think it states very clearly, and it's quoted in our brief at page 46. I think it sets forth Illinois law on the subject. And I see that the red button is on. I appreciate the time and the consideration of the court, and I ask that this matter be affirmed. Thank you, Mr. Secretary. Thank you. Mr. Hershberger. Thank you, Your Honor. Because I took too long the first time, I'll try to take less than my allotted time on the three-minute rebuttal. In response to your question, which I thought was the question of the case, Judge Sutton, is reasonableness the standard? The answer is yes. And because reasonableness is the standard in motion to dismiss as improperly granted, we would request remand. With respect to the other question, which came down to peculiar control, which is something that has been discussed at length, I think that that's the error that the district court made in this case, which is distinct from the error that was urged upon it by Walgreens. The district court said there may have been seven other reasons that customers did not stay with this pharmacy. It could be loyalty to Jerry. They could have moved out of the area. They could have wanted to support small business, et cetera. If the evidence proves that those were the factors that caused this turnout to be met, I'm going to lose this case. I have the burden to show that it was Walgreens' failures, Walgreens' breach of the implied covenant, and that before those failures, these turnout targets would have been met. That's not easy proof. That's going to be my burden in this case. But that's not evidence that's of record, and if it was Walgreens' failures, that gives me a claim for breach of the implied covenant. With regard to the control, it is never exclusively, and that's why the word peculiar is somewhat peculiar in this context, it is never exclusively in the control of an acquiring party whether an earn-out is going to be met. An earn-out comes from people buying the product. Those people are third parties. They're not here. They're not parties to the contract. What motivated them? Those are all fact questions that I want to develop. It was a Diane that had the earn-out provision. No, that's Baraha. The Baxter needle case is one of the earn-out cases. We actually cited a number of earn-out cases, although quite a few of them were not from Illinois, but the theory is the same, that the party who has acquired the assets can't control whether an earn-out is met. If that were the case, there wouldn't be a reason to have this sort of contingency. If they had full control over it, we'd know at the time of the Asset Purchase Agreement whether they were going to meet it. Baraha says, among other things, they could meet it. The more that's true, the more I say to myself, what in the world is the lawyer thinking? The more obvious the control is, the more obvious it is. You put a best efforts clause in there. You try to define it. Right? That seems pretty common sense here. But a best efforts, especially if you represent David, you're negotiating with Goliath. Goliath says, I don't want a best efforts because I don't want you questioning every decision I make. I don't get to question every decision, but if you don't – David paid Goliath a lot of money. Pardon? David paid Goliath a lot of money. In other words – Yeah, David got the money this time. David did fine. It's true. David did fine. David did fine. David just bought a very large slingshot. Well, I think I think we've – yes. Thank you for your time. Thanks to both of you for your briefs and for answering our questions. It's an interesting case, so thank you very much.